UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
DOCKET NO. 1:17-cv-00296-MOC-WCM

| | | |
|---|---|---|
| **WANDA S. LEONARD**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **THE TRUSTEES OF CLEVELAND** | ) | |
| **COMMUNITY COLLEGE** | ) | |
| **CLEVELAND COMMUNITY COLLEGE**, | ) | |
| | ) | |
| Defendants. | ) | |

     **THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment. Plaintiff Wanda Leonard filed this action on October 30, 2017, alleging she was terminated from her employment because of her age, in violation of state and federal law. Defendants deny Plaintiff's allegation of age discrimination and argue that they terminated her employment for a legitimate business reason. On December 1, 2018, Defendants filed the present motion and supporting memorandum, which has been fully briefed and is ripe for review. The Court heard oral arguments on the motion on March 7, 2019. This *Court* is aware that some companies today attempt to disguise an unconstitutional reason for termination using a pretextual "legitimate business reason" for their decision. However, that is not what we have in this case. Having considered the matter, the Court enters the following findings, conclusions, and Order granting summary judgment in favor of Defendant.

## I.    Introduction

     On July 1, 2004, Plaintiff Wanda Leonard ("Plaintiff") entered into an employment contract with Cleveland Community College ("Cleveland-CC") and The Trustees of Cleveland

Community College (collectively "Defendants") to serve as Discipline Coordinator of the Foothills Surgery Technology Consortium—a surgical technology training program with classroom and clinical components that pulls students from Cleveland-CC, Isothermal Community College, and McDowell Technical College (the "Consortium"). The Discipline Coordinator of the Foothills Surgery Technology Consortium is employed by Cleveland-CC and is responsible for overseeing the program. As Discipline Coordinator, Plaintiff was responsible for overseeing, among other things, the program and providing a high-quality learning experience for students, recruiting students to the program, assuring compliance with state and national accreditation standards, and working cooperatively with others in a collegial environment.

Plaintiff's direct supervisor was Dr. Becky Sain, Vice President of Academic Programs at Cleveland-CC ("Dr. Sain"). Dr. Sain was responsible for, among other things, completing Plaintiff's annual employment evaluations and working with Plaintiff on ways to improve her performance and improve the surgical technology program. Consistent with Cleveland-CC's general policy for full-time employees, Plaintiff's employment contracts were issued on a year-to-year-basis and required renewal upon expiration of the previous employment term. Plaintiff's final employment agreement lasted through June 30, 2016. On June 15, 2016, Plaintiff was notified that her employment contract would not be renewed for the upcoming year.

Defendants assert that they terminated Plaintiff's employment because of her continuous "unprofessional treatment of students and the unhealthy learning environment she created[, which] resulted in low retention rates." Defs.' Mem. (#20) at 8. Defendants assert that these problems were longstanding and systemic, impacting both the students and the Consortium's relationship with clinical and collegial affiliates. See Defs.' Mem. (#20) at 3 (indicating Dr. Sain first became aware of issues with Plaintiff's work performance as Discipline Coordinator as early as 2010).

More specifically, Defendants allege,

> Plaintiff was not satisfactorily performing the essential functions of her job; she had poor interactions with students spurring years of student complaints about her behavior; the Surgical Technology Program suffered from poor recruitment and low retention/graduation of students; relationships with clinical sites failed and some were ultimately lost; and sustainability of the program with partnering colleges in the consortium deteriorated.

See Defs.' Mem. (#20) at 3. Defendants claim they informed Plaintiff about her performance problems several times, counseled her on ways to improve, and gave her numerous opportunities to adjust her attitude, behavior, and methods. Defendants claim that by June 2016 Plaintiff's work performance still had not improved, and Dr. Sain advised against renewing her employment contract.

## II.     Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient

evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255; Educ. Media Co. at Va. Tech, Inc. v. Insley, 731 F.3d 291, 297 (4th Cir. 2013). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to create a genuine dispute]; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law."  Id.

### III.    Statutory Framework for Age Discrimination

Plaintiff alleges age discrimination under both federal and state law.  The federal claim is based on the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, and the state claim is based on the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. GEN. STAT. § 143-422.2.  The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  The NCEEPA prohibits discrimination based on age as against public policy, and provides:

> [I]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

N.C. Gen. Stat. § 143-422.2 (1977). The statute provides a cause of action for those alleging wrongful discharge based on age. Rishel v. Nationwide Mut. Ins. Co., 297 F. Supp. 2d 854, 875 (M.D.N.C. 2003). When considering a wrongful discharge claim based on age under North Carolina law, the court applies the same standards that apply under the ADEA. Id.; accord Moser v. Driller's Serv., Inc., 988 F. Supp. 2d 559, 565 (W.D.N.C. 2013); Matthews v. Novant Health, Inc., No. 3:09CV494, 2010 WL 2131559, at *7 (W.D.N.C. Apr. 29, 2010) (report and recommendation adopted) ("Regarding Plaintiff's state public policy claim, North Carolina courts "look to federal decisions [in employment discrimination cases] for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases.") (quoting N.C. Dep't of Corr. v. Gibson, 308 N.C. 131, 136 (1983)).

An ADEA plaintiff may prove age discrimination in one of two ways: by proving a "prima facie case" of age discrimination, which establishes a rebuttable presumption that the employer violated the ADEA; or by offering direct or circumstantial evidence of an employer's discriminatory animus. Arthur v. Pet Dairy, 593 F. App'x 211, 216 (4th Cir. 2015) (unpublished); see Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (en banc), abrogated in part by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). Regardless of the method chosen, it remains the plaintiff's ultimate burden to prove that his age was the but-for cause of the adverse employment action. See Gross, 557 U.S. at 180. Here, Plaintiff claims she provided evidence establishing a genuine dispute as to whether she can make out a prima facie case of age discrimination.[1]

---

[1] "[T]his action presents a unique fact pattern based on the undisputed evidence." Defs.' Mem. (#20) at 15. Defendant argues Plaintiff's claim is more akin to a "failure to hire" claim, rather than a "termination" claim, because Plaintiff "had not [sic] continued interest in her position or right to

## A. Prima Facie Case

An ADEA plaintiff may establish a presumption of discrimination by making out a prima facie case of age discrimination under <u>McDonnell Douglas Corp. v. Green</u> and its progeny. 411 U.S. 792, 802 (1973); <u>see</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142–43 (2000); <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506–07 (1993); <u>Arthur</u>, 593 F. App'x at 216–17. Though "the plaintiff's burden is not onerous," she must nevertheless prove her prima facie case by a preponderance of the evidence. <u>Warch v. Ohio Cas. Ins. Co.</u>, 435 F.3d 510, 515 (4th Cir. 2006). To establish a prima facie case for termination on the basis of age, the plaintiff must show (1) she was a member of the protected class, namely, "individuals who are at least 40 years of age," 29 U.S.C. § 631(a); (2) she was performing her job duties according to her employer's legitimate expectations at the time of termination; (3) she was terminated; and (4) she was replaced by a substantially younger individual. <u>Hill</u>, 354 F.3d at 285; <u>Arthur</u>, 593 F. App'x at 216–17.

Whether an employee met her employer's legitimate expectations at the time of termination depends on the "perception of the decision maker . . ., not the self-assessment of the plaintiff," and not the opinions of the plaintiff's coworkers. <u>Hawkins v. PepsiCo, Inc.</u>, 203 F.3d 274, 280 (4th Cir. 2000). And because it is the plaintiff's burden to persuade the trier of fact that she met her

---

employment beyond the expiration of her employment contract." Defs.' Mem. (#20) at 15. While it is undisputed that Plaintiff was employed by Cleveland-CC when she was told her contract would not be renewed, Plaintiff was paid the remainder of her contract term. Regardless of whether the adverse employment action is categorized as a "termination" or "failure to hire," the label given to Plaintiffs' claim is "not critical to the legal analysis." <u>Leibowitz v. Cornell Univ.</u>, 584 F.3d 487, 501 (2d Cir. 2009) ("Although the parties focus on the terminology used with respect to the plaintiff, *whether plaintiff was 'laid off' or 'terminated,'* or her employment was 'not renewed' *is not critical to the legal analysis*; rather, she suffered an adverse employment action because she was denied the requested continued employment, regardless of the label.") (emphasis added).

employer's legitimate subjective employment expectations, at the prima facie stage, the Court must consider the employer's "evidence that the employee was not meeting those expectations." <u>Arthur</u>, 593 F. App'x at 217 (quoting <u>Warch</u>, 435 F.3d at 516). Otherwise, it would be "difficult to imagine a case where an employee could not satisfy the . . . legitimate expectation element." <u>Id.</u>

**(1) Over 40 Years of Age.** Plaintiff was 62 years old at the time of the adverse employment action. <u>See</u> Pl.'s Resp. Mem. (#25) at 2. This element is not in dispute.[2]

**(2) Employer's Legitimate Expectations.** As to the second element, Defendants argue Plaintiff was not performing her job duties pursuant to Cleveland-CC's legitimate expectations when she was told her contract would not be renewed. Plaintiff contends her "evaluations from her managers over the years reflected her success in the program," and that "through her last evaluation in May, 2016, plaintiff's performance in her position was not questioned." <u>See</u> Pl.'s Resp. Mem. (#25) at 4. "While her disciplined teaching and testing style drew some complaints, primarily from students who could not succeed, it was recognized, at least implicitly, that her performance was beyond satisfactory. In fact, plaintiff never received any specific criticism for her performance." <u>Id.</u>

Defendants do not dispute that Plaintiff was well qualified for the Discipline Coordinator role, nor do they repudiate Plaintiff's knowledge or skill in the area of surgical technology. In fact, Defendants commended Plaintiff's competency during oral arguments and expressed appreciation for her years of service in the position. Defendants maintain, however, that there

---

[2] Defendants state Plaintiff was 63 years old "at the time the decision to not renew her contract was made." <u>See</u> Defs.' Mem. (#20) at 20. Plaintiff states she was 62 when she was removed from her role. It is undisputed that Plaintiff was informed that her contract would not be renewed June 15, 2016, and that her contract term ended on June 30, 2016. <u>See</u> Defs.' Mem. (#20) at 3; Pl.'s Resp. Mem. (#25) at 13. The Court will assume Plaintiff was 62 when she was terminated and that her age is not in dispute. In any event, Plaintiff satisfies the first element.

were several problems with her methods and practices as a surgical technology instructor which prevented her from meeting Cleveland-CC's "legitimate expectations" when she was terminated.

Defendants presented evidence showing Plaintiff's performance issues were well-documented and that complaints about Plaintiff were brought to Dr. Sain's attention several times over the years. <u>See generally</u> Leonard Performance Evaluations (#23-18) (showing all but three of Leonard's annual employment evaluations from 2005 through 2016); <u>see also</u> Sain Dep. (#20-1) at 34:6–24, 104:25–105:4 (noting that complaints about Plaintiff "became more frequent" in 2010 and that she "had coached Ms. Leonard for the last six years, strongly coached Ms. Leonard into changing her behavior, her reputation with the clinical sites, and . . . the way that she worked with her colleagues"). This evidence contradicts Plaintiff's assertion that she "never received any specific criticism for her performance." Pl.'s Resp. Mem. (#25) at 4.

Defendants claim Plaintiff did not meet their legitimate expectations because her "unprofessional and disruptive" behavior made the school's program and reputation suffer. They claim her behavior garnered complaints from students, fellow Cleveland-CC instructors, hospitals/clinical sites that participated in the program, and even administrators from partnering colleges. <u>See</u> Defs.' Mem. (#20) at 3–9. According to her annual employment evaluations, Plaintiff was at least generally aware that complaints had been made against her. <u>See, e.g.</u>, Defs.' Reply Mem. (#26) at 4–6 (citing various complaints that were noted in Plaintiff's annual employment evaluations)[3]; <u>see generally</u> Leonard Performance Evaluations (#23-18); <u>but see</u>

---

[3] Plaintiff's employment evaluation for academic year 2010–2011 states:

    4.2 Clinical sites have complained about some of the interaction between Wanda and the site. Complaints include not getting along with clinical staff, belittling clinical staff, complaining about sites to the students.
    . . . .
    6.1 Wanda has received a number of comments and complaints from students,

supra section B.1. The employment evaluations also indicate Plaintiff was informed about the school's dissatisfaction with her low recruitment and retention rates, advised that she need to increase her performance in both areas, and "continuously coached" by Dr. Sain on improving student interactions. See Defs.' Mem. (#20) at 5.[4]

---

> clinical sites and administrators.
>
> 6.2 Wanda is respectful in hearing suggestions, but when given the directive not to bad month [sic] a clinical site, the advisory meeting was spent with her injecting negative comments (i.e. pay for staffers)[.]
>
> 6.4 Clinical sites and operation committee have reported negative comments in the classroom and clinical sites. Students have reported Wanda belittles Ms[.] Dover and her teaching both in her presence and when she is not present.
>
> 6.5 Wanda is a strong leader, but sometimes uses intimidation as her way to get everyone to follow. More people would follow if she focused on sharing her knowledge.
>
> 6.7 Wanda is reliable, and [she] can work independently in performing assigned tasks. In some ways she has a collaborative attitude toward others working in the clinical site, and she talks about accepting change. However, she does not present a positive attitude, and has made unprofessional remarks concerning coworkers and future employees in the clinical settting [sic]. (e.i. [sic] clinical sites).

Leonard Performance Evaluations Ex. 18 (#23-18) at 12–16. Plaintiff's evaluation for academic year 2011–2012 states: "Last year Wanda had to work on relationships with the clinical sites. This year she has had to work with students who were quiet [sic] vocal about their likes and dislikes. Wanda understands she has a big job ahead of her learning to coach students to success." Id. at 23. Plaintiff's performance evaluation for academic year 2012–2013 states:

> . . . 4.2 Wanda has received several student complaints that required in-depth investigation. . . .
>
> . . . .
>
> 6.1[] Wanda interacts well with peers, but [she] needs to monitor how she comes across to students and potential students.
>
> 6.2 Wanda accepts ideas from others, but is not receptive to owning the idea once in place (selection process 2013 and rubric)[.]
>
> 6.4 From outward appearance it may seem everything is fine, but internally there were conflicts. Wanda needs to delegate task and hold others accountable for their duties. . . .

Id. at 28–30.

[4] Plaintiff's employment evaluation for academic year 2011–2012 states:

> . . . Wanda needs to work on retention. Surg Tech has lost almost 2/3 of their students for various personal and work[-]related reasons. . . . Surg Tech is a consortium program and without sufficient numbers in the program we are in jeopardy of losing the other colleges.

However, overall, Plaintiff's annual employment reviews were generally very positive. Throughout her employment, Plaintiff received encouraging feedback from Dr. Sain about her performance as Discipline Coordinator. Though she received poor markings in areas such as "Interpersonal Skills/Professionalism" and upholding the integrity of the college, see Leonard Performance Evaluations (#23-18) at 14–15, 29, she received satisfactory markings in most other areas, such as "Facilitating Instruction" and "Instructional Support." See id. at 13, 27. Thus, while her evaluations contained negative comments, they gave an overarching impression of general satisfaction mixed with constructive criticism. The Court is mindful that "an employee's perception of [her] own performance cannot establish a genuine issue of material fact as to whether the employee was meeting [her] employer's legitimate expectations," Wood v. Town of Warsaw, N.C., 914 F. Supp. 2d 735, 744 (E.D.N.C. 2012) (citing King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003)), but the Court must likewise be mindful of how well Defendants conveyed their expectations to Plaintiff. And given the generally positive nature of Plaintiff's employment reviews, the Court is hard-pressed to conclude there is no evidence upon which a reasonable jury could find Plaintiff was meeting Cleveland-CC's legitimate expectations when she was terminated. In the light most favorable to Plaintiff, the second element is established.

**(3) Adverse Employment Action (Termination).** A plaintiff must prove she suffered an "adverse employment action" to bring an ADEA claim. "An adverse employment action is a discriminatory act which adversely affects the terms, conditions or benefits of the plaintiff's employment," James v. Booz–Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004), and

---

Leonard Performance Evaluations (#23-18) at 18. Plaintiff's 2012–2013 evaluation states: "Retention of students must be a priority. With a completion rate of 25% for summer 2013, everything must be evaluated as to whether it has help to increase or decrease student retention." Id. at 28–30. Plaintiff's 2015–2016 evaluation was less detailed, but it notes a 50% pass rate in Fall 2015 and advises Plaintiff to "[c]ontinue to work on retention." See id. at 31–32.

"constitutes a significant change in employment status." Darnell v. Tyson Foods, Inc., No. 3:11CV473, 2012 WL 6093076, at *5 (W.D.N.C. Dec. 7, 2012), aff'd, 536 F. App'x 366 (4th Cir. 2013). Termination, failure to hire, and failure to renew an employment agreement all constitute adverse employment actions. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

Defendants argue that Plaintiff was not "terminated" because she was employed under a year-to-year contract and was paid through the remainder of her final term. Defendants contend that Plaintiff had no continued interest in the position or right to employment beyond the expiration of the term and they argue this matter should be evaluated as a "failure to hire" case. However, as previously stated, see supra note 3, whether the adverse employment action is labelled as a "termination" or a "failure to hire" is "not critical to the legal analysis." Leibowitz, 584 F.3d at 501. Plaintiff must establish only that an adverse employment action has taken place, which she has done. And while Defendants do not concede that Plaintiff was "terminated," they do not dispute that failing to renew her employment contract was an adverse employment action. As such, the third element is satisfied.[5]

   **(4) Substantially Younger Replacement.** The age of the replacement is not determinative

---

[5] Given that the circumstances are akin to an employer-employee relationship, the Court will refer to the adverse employment action as "termination." The facts suggest Cleveland-CC and its administrators treated Plaintiff as if she were a full-time, salaried employee. She worked full-time at Cleveland-CC for 12 years and purportedly built the school's surgical technology program from the "ground up." Pl.'s Resp. Mem. (#25) at 11–13. According to Plaintiff, her employment contracts with Cleveland-CC "were automatically renewed, year after year, from 2004 until her termination in 2016." Id. at 12. Plaintiff was also permitted to hire a full-time and part-time assistant. Id. at 3. Over the course of several years, she was asked about her plans to retire multiple times and likely believed that the decision to part ways would be hers to make. Although technically a contract employee, Plaintiff's relationship with Defendants was such that Plaintiff reasonably expected that relationship to continue and, therefore, the Court will evaluate the allegations of age discrimination under the "termination" framework, but, again, the Court notes this designation is for the sake of clarity and not critical to the legal analysis. Leibowitz, 584 F.3d at 501.

of the "substantially younger" prong. The Fourth Circuit has not adopted a bright-line test to determine what age difference is substantially younger. Ulrich v. Cexec, Inc., 223 F. Supp. 3d 525, 527 (E.D. Va. 2017). Moreover, "[i]n an ADEA case, the plaintiff need not be replaced by someone outside the protected class (i.e., someone under 40), provided that the replacement is younger than the plaintiff." Neal v. Green Ford, LLC, No. 1:17-CV-569, 2018 WL 6003547, at *6 (M.D.N.C. Nov. 15, 2018) (citing Burns v. AAF-Mcquay, Inc., 96 F.3d 728, 731 (4th Cir. 1996)); see also O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312–13 (1996) ("That one member of the protected class lost out to another member is irrelevant, so long as he lost out because of his age. The latter is more reliably indicated by the fact that his replacement was substantially younger than by the fact that his replacement was not a member of the protected class."); Laprise v. Arrow Int'l, 178 F. Supp. 2d 597, 605 n.8 (M.D.N.C. 2001). Under the modified-proof scheme set forth in McDonnell Douglas, a plaintiff attempting to satisfy the "substantially younger" element may establish a prima facie case by showing "either that he was replaced by someone who was 'substantially younger' or other evidence to create an inference of an impermissible motivation." Cramer v. Intelidata Techs. Corp., 168 F.3d 481 (4th Cir. 1998) (unpublished table decision); see O'Connor, 517 U.S. at 311–12 (modifying the fourth element of the scheme); Burns, 96 F.3d at 731 n.1.

Defendants admit Plaintiff's replacement is younger, but they argue she is not "substantially younger" than Plaintiff. See Defs.' Mem. (#20) at 15 ("Ms. Dover is only seven years younger than Plaintiff which is not substantially younger than Plaintiff and is not a reliable indicator of age discrimination."). The record indicates Dover is actually six years younger than Plaintiff, not seven. See supra note 4.

Some courts have found six years to be an insignificant difference in age where the plaintiff

did not offer any evidence that age may have played a role in the plaintiff's termination. See, e.g., Darnell, 2012 WL 6093076, at *7 (finding the six-year age difference insufficient by itself to satisfy substantially younger requirement where there was no evidence to suggest discrimination); Kess v. Mun. Emps. Credit Union of Baltimore, Inc., 319 F. Supp. 2d 637 (D. Md. 2004) (finding plaintiff "failed to carry her ultimate burden of establishing a reasonable inference of impermissible age discrimination" where she had been replaced by a worker eight years younger but offered only weak evidence to support the inference that the employment decision was based on illegal criteria).

Here, Plaintiff's evidence of age discrimination is admittedly weak, but it is enough to establish an inference of impermissible motivation. Plaintiff claims she was asked about her plans to retire several times over the years, and that she was terminated shortly after Dr. Sain's most recent inquiry into her retirement plans. The age-related nature of this question, combined with its temporal proximity to Plaintiff's termination, suggests she may have been fired because of her age. And Defendants have not provided support or credible justification for their position that such evidence does not create at least an inference of impermissible motivation. See Cramer, 168 F.3d 481 (4th Cir. 1998) (unpublished table decision) (citing O'Connor, 517 U.S. at 311–12 (modifying the fourth element of the scheme)). Resolving all factual disputes in Plaintiff's favor, Anderson, 477 U.S. at 255, the Court finds she has satisfied the fourth element and, therefore, established a prima facie case of age discrimination.

### B.  Legitimate Reasons for Termination

Because Plaintiff has not presented any direct evidence of age discrimination, the Court analyzes her claim under the familiar, burden-shifting framework of McDonnell Douglas Corp. v. Green.  411 U.S. at 802–05; see Reeves, 530 U.S. at 142–43 (explaining that the core issue of

whether discrimination exists in an ADEA pretext case is not reached unless the employee proves a prima facie case and the employer meets its burden to produce a "legitimate, nondiscriminatory reason" for the adverse employment action); Mereish v. Walker, 359 F.3d 330, 334 (4th Cir. 2004). To prevail under the McDonnell Douglas framework, once the plaintiff has established a prima facie case of unlawful age discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the termination. Warch, 435 F.3d at 513–14. This is a burden of production, not persuasion. Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). Once the defendant-employer has shown that it had legitimate reasons for terminating the plaintiff, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is not the true reason, but a mere pretext for discrimination. Warch, 435 F. 3d at 513–14; see also Kinser v. United Methodist Agency for the Retarded, No. 14-1955, 2015 WL 3397056, at *2 (4th Cir. May 27, 2015). To show pretext, Plaintiff may introduce evidence to show that "the employer's proffered explanation is unworthy of credence." Holland, 487 F.3d at 214.

Defendants offer five reasons for terminating Plaintiff's employment. The Court will address each in turn, along with Plaintiff's pretext arguments. For the reasons given below, Defendants have met their burden of proving they had legitimate motives for terminating Plaintiff.

### 1. Plaintiff did not treat surgical technology students with respect.

Testimony from Dr. Sain indicates she received complaints from students about Plaintiff every year from 2010 through 2016. See Defs.' Mem. (#20) at 4; Sain Dep. (#20-1) at 34:6–24. "Notably, the entire 2015 graduating class met with Dr. Sain to complain about Plaintiff and even wrote a letter regarding their experience and the unacceptable behavior of Plaintiff." Defs.' Mem. (#20) at 4.

Plaintiff claims she "was never informed of student complaints, including complaints from the Class of 2015, regarding her alleged belittling of students or inappropriate demeanor." Pl.'s Resp. Mem. (#25) at 12. However, Defendants provided copies of several annual employment evaluations which noted that students complained about Plaintiff and which indicated that Dr. Sain advised Plaintiff to make an effort to improve student relations. Id. at 5. Plaintiff has submitted no evidence to challenge the truth of the statements or legitimacy of these evaluations. The Court must, therefore, agree with Defendants that "any assertions that Plaintiff was not aware of these issues with her performance is unfounded and contradicted by the undisputed evidence as Plaintiff signed her annual evaluations which noted performance concerns and areas that needed improvement." Defs.' Reply Mem. (#26) at 4. The Court further notes that, even if Plaintiff had *not* been made aware of student complaints while she was employed at Cleveland-CC, Plaintiff has still failed to produce any evidence indicating that she did, in fact, treat students with respect, or that Defendants condoned her behavior or were dismissive to the point of approving her conduct toward students, or that other, younger employees disrespected students with impunity. This sort of indirect evidence would have at least created some question of fact about whether Defendants truly believed she deserved to be discharged. However, given the absence of any such evidence, the Court cannot find this proffered reason is a pretext for discrimination.

## 2. Relationships with clinical sites deteriorated and some were ultimately lost under Plaintiff's leadership.

Defendants argue that clinic sites complained that Plaintiff constantly belittled and berated students in front of operating room (OR) managers, nurses, and doctors. Apparently, "she would come in in the middle of procedures, she would berate students in the middle of procedures." Sain Dep. (#20-1) at 141:11–12. At one hospital, a sign was placed on the Operating Room door, stating that no one was allowed to enter after a procedure began in effort to keep Plaintiff out. Defs.'

Mem. (#20) at 5 (citing Sain Dep. Ex. 1 at 142:6–16). Dr. Sain also recalled in her deposition:

> There was an incident, I think, at Rutherford where she was berating a student in the lounge, and they felt like that was unprofessional. That she should have been quiet about it, but not berating her in front of other people. They had incidents were [sic] students would be reduced to tears.

Sain Dep. (#20-1) at 141:20–25. Dr. Sain also testified that, during Plaintiff's employment, seven clinical sites decided to no longer participate in the Surgical Technology Consortium because of Plaintiff. Defs.' Mem. (#20) at 6 (citing Sain Dep. Ex. 1 at 202:15–203:12). But see Leonard Dep. (#23-2) at 55–56 (denying that any clinical sites ever withdrew from the program or decided not to renew their contracts during her tenure). "Importantly, after Plaintiff was no longer with the program, several former clinical sites agreed to rejoin and opened their sites back up for clinicals." Defs.' Mem. (#20) at 6 (citing Sain Dep. Ex. 1 at 202:15–203:12). Emails from managers at clinical sites confirm Defendants' contentions regarding not only Plaintiff's unprofessional behavior, but also the school's assertions about the unhealthy atmosphere her behavior created. Lance Coleman, Director of Surgical Services at Rutherford Regional Health System, stated this in an email to Dr. Sain:

> The educational atmosphere created during Ms. Leonard's time at RRHS was unhealthy. Over the years I witnessed Ms. Leonard intimidate, belittle, and harass students to the point of tears and even quitting the program. As a director of CST students she would come into our OR and be disrespectful to staff and surgeons. I personally witnessed this behavior and confronted her on many occasions. She also failed many students that would have been great techs due to personality differences.

Defs.' Prod. Ex. 3 (#20-3) at 121. In another email, Tammy Tysinger, OR Nurse Manager at Carolinas Healthcare System, stated:

> Our former director, who is now retired, at one point requested to withdraw our facility from their clinical rotation. She asked that Mrs. Leonard not be allowed in our facility/ operating room, and she and Dr. Barringer requested a meeting with the dean of the college to address these concerns. Mrs. Leonard and I did not have personal issues, however, I observed on more than one circumstance, her speaking

negatively to her students. She was very inappropriate in how she handled discipline. We asked her many times to please discuss what the students were doing wrong in private, or in an office. She would blast them in front of staff, Dr.'s, management, to the point the students were in tears. My CST's that were precepting the students asked multiple times to keep her out of their rooms. They said she made the students nervous and upset, and she talked bad to them during the case, which then made them perform more poorly.

Defs.' Prod. Ex. 3 (#20-3) at 118. Other than her own testimony denying that any sites ever withdrew from the program, see Leonard Dep. (#23-2) at 55–56, Plaintiff has offered no emails, affidavits, or other evidence from clinical sites challenging Defendants' allegations. Finally, Defendants have presented evidence showing that Dr. Sain noted in Plaintiff's employment evaluations that clinical sites complained about Plaintiff's behavior and her negative interactions with students and staff at clinical sites. Defs.' Mem. (#20) at 6. Plaintiff generally denies that she was ever told about the clinical sites being critical about her performance there, but, she offers only her own testimony for support. Leonard Dep. (#23-2) at 93:19–23. Absent more, the Court cannot find this stated reason was a pretext for discrimination.

### 3. The Surgical Technology Consortium suffered from poor recruitment during Plaintiff's time as Discipline Coordinator.

The Surgical Technology Program could admit 30 students per year but admitted less than 30 from 2012–2016. Defendants attribute low enrollment to Plaintiff's unprofessionalism and they contend her improper conduct became well known in the community and caused some prospective students to go elsewhere. Defs.' Mem. (#20) at 6. "Remarkably, in July 2016, three students who had initially declined to enroll in the Surgical Technology Program under Plaintiff enrolled once they found out that Plaintiff was no longer the Discipline Coordinator." Id. at 6–7; see Sain Dep. (#20-1) at 75:8–11 ("[W]e had students who had declined to come in the program, come back and ask us to allow them to come back into the program after they found out Ms. Leonard was not there."). Notably, Plaintiff offers no evidence to support these general claims, and she does not

appear to challenge Defendants' contentions that her recruitment rates were poor. She merely offers various reasons why she believes rates were low. See, e.g., Leonard Decl. (#23-1) at 11–12 (stating "some unqualified students were being recruited from high school and accepted in the program for the wrong reasons" and that she "did not have complete control on who was recruited"). Plaintiff does not deny that it was her responsibility to recruit students or that recruitment suffered during her tenure.[6] Nor does she offer evidence indicating that the poor recruitment rate was not a legitimate reason for her termination. Thus, the Court cannot find this reason is a pretext for discrimination.

### 4. Under Plaintiff's leadership, the Surgical Technology Consortium had insufficient retention rates.

It is undisputed that retention concerns were discussed with Plaintiff over several years before her termination, and that Plaintiff was advised of the need to increase student retention. Defs.' Mem. (#20) at 8 (citing annual employment evaluations signed by Plaintiff, noting that Dr. Sain discussed issues with the program's retention of students and coached Plaintiff on ways to improve student relations and retention). While Plaintiff was continuously made aware of student treatment and the resulting low retention rates, Defendants argue that Plaintiff make no discernable attempt to change her methods and retention did not improve. Id.

Despite substantial evidence to the contrary, Plaintiff states in her affidavit that the program's retention rate was "satisfactory throughout the time of my employment, and was consistent with the state and national averages." Leonard Decl. (#23-1) at 12. She further states that, while retention rate was "concerning at times during [her] employment," the circumstances

---

[6] Plaintiff merely states that she knew that one of the "keys to a successful program was in the recruitment of qualified students" and claims she was "extremely selective, striving to find high school graduates, displaced workers, or other workers seeking new careers who could satisfy the rigors of the program." Pl.'s Resp. Mem. (#25) at 3. She does not otherwise address the issue.

were such that the "problem could not reasonably be attributed to [her]." Id. Plaintiff, instead, blamed the quality of the students in her programs, claiming they were "not qualified" or were "not able to graduate from our program, which, of course, affected the retention rate." Id. at 12. But nowhere does Plaintiff address Defendants' very specific allegations regarding her poor retention rates.[7] See Defs.' Mem. (#20) at 7. Instead, she focuses on the poor retention rate of her replacements—which, the Court notes, is significantly better than her own retention rates over the past few years—stating that her replacements "did not meet the retention analysis of 70% set by ARC/STSA." Plaintiff attempts to further confuse the issue by responding with other, more favorable statistical figures, such as "100% of plaintiff's students passed the national exam" in the 2015-2016 academic year. Pl.'s Resp. Mem. (#25) at 12. This tactic is particularly bold, considering only 7 of the 14 students that started the program that year actually graduated, meaning only seven students took the exam the year she boasts about having a 100% pass rate. See Defs.' Mem. (#20) at 7. Given that Plaintiff has provided no evidence suggesting her retention rate was not a legitimate reason for her termination, the Court cannot find such reason is a pretext for discrimination.

---

[7] "Retention is significant for the Surgical Technology Program because the accrediting body for surgical technology programs, the Accreditation Review Council on Education in Surgical Technology and Surgical Assistance ("ARC/STSA"), requires a certain level of retention." Defs.' Mem. (#20) at 7. According to the 2016 ARC/STSA Annual Report, Plaintiff's retention rates for the Surgical Technology Consortium during the last few years of her employment were as follows:
· 2012-2013 academic year, 23 students started the program, only 7 graduated (30% graduation rate)
· 2013-2014 academic year, 25 students started the program, only 13 graduated (52% graduation rate)
· 2014-2015 academic year, 18 student started the program, only 9 graduated (50% graduation rate)
· 2015-2016 academic year, 14 students started the program, only 7 graduated (50% graduation rate)
Id. (citing (Ex. 3 at 029)). "Under Plaintiff's leadership, the Surgical Technology Program consistently did not meet or exceed the ARC/STSA threshold. (Ex. 3 at 138)." Id.

**5. The other two partnering colleges threatened to pull out of the Surgical Technology Consortium under Plaintiff's leadership.**

Defendants next claim the two other Surgical Technology Consortium partners, McDowell and Isothermal, "were aware of Plaintiff's behavior and the impact it had on retention rates and threatened to dissolve the consortium." Defs.' Mem. (#20) at 8. Specifically, Dr. John Gosset from McDowell met with Dr. Sain, along with representatives from Isothermal, "in effort to strengthen graduation rates that were low because of Plaintiff." Id. at 9. Dr. Gosset's affidavit indicates McDowell expressed these concerns to Dr. Sain before 2016 and eventually informed her during the meeting that McDowell would consider dissolving the Consortium if the program did not improve.

> When I arrived at McDowell Technical Community College four years ago as the Chief Academic Officer I noticed that we had far more students enter Surg Tech than graduate. Rumors were that Ms. Leonard was less than supportive, especially to students outside of Cleveland County. While I never talked specifically to any student about this other staff members at MTCC did which supported my concerns of student dissatisfaction with the program. . . .
> . . . .
> I began discussions with my counterpart at Isothermal Community College to determine if they were seeing similar trends. They were. We met informally with Dr. Becky Sain to discuss the situation in an effort to strengthen graduation rates. In that meeting, I informed Dr. Sain that if the program did not improve I would recommend to Dr. Bryan Wilson, President of McDowell Tech, that we re-examine our consortia relationship for Surg Tech with all options available, including dissolving the consortium.

Gossett Aff. (#19-4) at 2, 5. According to Defendants, Cleveland-CC was highly concerned because "[w]ithdrawal of the other colleges would necessarily eliminate the other two sites where classes were provided and would likely reduce the number of students who would enroll in the program." Defs.' Mem. (#20) at 9.

Ultimately, both McDowell and Isothermal withdrew from the Consortium anyway after Plaintiff was terminated. See Pl.'s Resp. Mem. (#25) at 11. The program now just enrolls

Cleveland-CC students.  Id.  When pressed on this issue during oral arguments, Defendants explained that, for McDowell and Isothermal, the damage was done by the time Plaintiff was terminated and the Consortium was apparently no longer sustainable.  Plaintiff argues their withdrawal after her termination indicates Defendants' proffered reason is not true but is, instead, a pretext for discrimination.

Plaintiff also claims the letter from Dr. Gossett to Cleveland-CC expressing his gratitude for Plaintiff's termination "was procured following plaintiff's termination in an after-the-fact effort to create and bolster a newly-created narrative by defendants about why plaintiff was terminated." Pl.'s Resp. Mem. (#25) at 13; see Gossett Aff. (#19-4) at 5 (showing letter is dated September 23, 2016).  Because the letter was drafted nearly four months after Plaintiff's termination, she argues this letter—as well as other evidence acquired after-the-fact—are merely post hoc reasons for Defendants' action, which had not been shared with Plaintiff in her evaluations or at the time of her dismissal.  See Pl.'s Resp. Mem. (#25) at 5, 13.  For reasons detailed below, the Court disagrees.

Defendants' evidence acquired after her termination about their conversations with Isothermal and McDowell during Plaintiff's employment are all consistent with one another.  Such after-acquired evidence is also consistent with evidence documented before Plaintiff was terminated.  Beyond that, Plaintiff offers no emails, affidavits, or other evidence to contradict Defendants' claims about her "notoriety" in the community.  While Plaintiff claims she was not informed about these discussions or told that her reputation at McDowell or Isothermal played a role in her termination, the school's failure to relay this information to her sooner does not mean that the explanation is a sham.  Likely, Defendants wanted to spare Plaintiff's feelings.  Just as likely, Defendants may have thought that telling Plaintiff would cause even more turmoil within

the Consortium. In any event, Plaintiff has not shown this reason is a pretext for discrimination.

The Court finds that Defendants have set forth legitimate, non-discriminatory reasons for the non-renewal of Plaintiff's employment contract and have, thus, met their burden under McDonnell Douglas.

### C. But-For Causation

Because Plaintiff has made out a McDonnell Douglas prima facie case, and Defendants have met their corresponding burden by showing that they had legitimate, non-discriminatory reasons for terminating Plaintiff, the Court must determine whether Plaintiff has satisfied "the ultimate burden of proof applicable to his pretext case: that [her] age was the but-for cause of [her] termination." Arthur, 593 F. App'x at 222; see Reeves, 530 U.S. at 142–43 (explaining that the core issue of "discrimination *vel non*" in an ADEA pretext case is not reached unless the employee proves a prima facie case and the employer meets its burden to produce "legitimate, nondiscriminatory reason[s]" for the adverse employment action).

The Fourth Circuit has noted that "ADEA plaintiffs face a high causation burden." Arthur, 593 F. App'x at 219. In order to prevail, an ADEA plaintiff must prove that discrimination was the but-for cause of the adverse employment action. Gross, 557 U.S. at 178. This burden differs greatly from the burden in "mixed-motive" claims under Title VII, which allow a plaintiff to avoid summary judgment "when [the] employee alleges that he suffered an adverse employment action because of both permissible and impermissible considerations." Arthur, 593 F. App'x at 219 (upholding summary judgment where "the evidence at best demonstrates that [plaintiff's] 'age was simply a motivating factor' in [the employer's] decision, not 'the but-for cause' of [plaintiff's] termination"); see Gross, 557 U.S. at 171; 42 U.S.C. § 2000e–2(m). "[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action because of age is that age was *the*

reason that the employer decided to act." Gross, 557 U.S. at 171 (emphasis added).

According to Gross v. FBL Financial Services, to show a but-for causal relationship for ADEA purposes, the plaintiff must present evidence that discriminatory animus was a "necessary logical condition" for the adverse employment action and that the employer did not act "because" of other legitimate motivations for the action.  557 U.S. at 176; see, e.g., Arthur, 593 F. App'x at 219 (upholding summary judgment where plaintiff did not meet its burden in showing age was a "necessary logical condition" for his termination where employer had other legitimate business motives to terminate him).  The but-for cause "need not be the sole cause of the adverse employment action." Arthur, 593 F. App'x at 220 (noting that "whether a legitimate business decision was the 'primary' reason for his termination is not material").  Indeed, "an employee need not refute each negative mark on his record or every possible legitimate ground for the employment decision." Id. (explaining "[a]ge discrimination cases often present more than one reason for an employer to take adverse action against an employee" and plaintiff need not disprove every proffered reason to avoid summary judgment).

Rather, under Gross, the employee must only demonstrate that, age-related considerations aside, the employer's other non-discriminatory grounds for termination did not cause the employer to take the adverse employment action.  Id.; see Gross, 557 U.S. at 171; Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993) (indicating an employer acts "because of" age when "the employee's protected trait actually played a role in the employer's decision[-]making process and had a determinative influence on the outcome").  In other words, if there existed other legitimate motivations for the decision, "the employee must offer sufficient evidence to show these factors were not 'the reason' for the employer's decision." Arthur, 593 F. App'x at 220.  When evaluating ADEA pretext cases on summary judgment, the court must focus on whether the plaintiff has

provided "sufficient evidence to cast doubt upon the employer's stated reasons for the employment action, such that a reasonable juror may find age was the determinative factor in that decision." Id. at 220–21.

Here, Plaintiff offers various reasons for why she believes Defendants' post-hoc justifications for her termination are unworthy of belief and merely a pretext for age discrimination. Many of these are addressed above in reference to each of Defendants' stated reasons for her termination. Her overarching argument, however, appears to be that Defendants procured much of their evidence in an "after-the-fact effort to create and bolster a newly-created narrative by defendants about why plaintiff was terminated." Pl.'s Resp. Mem. (#25) at 13. Notably, though, Plaintiff offers no evidence to support this claim other than her own testimony. She also offers no evidence showing Defendants did not legitimately believe she deserved to be terminated based on her performance.

Defendants, on the other hand, presented substantial evidence showing Plaintiff's performance issues were well-documented and brought to Dr. Sain's attention on many occasions. Plaintiff's "unprofessional and disruptive" behavior garnered complaints from students, fellow Cleveland-CC instructors, hospitals/clinical sites that participated in the program, and even administrators from partnering colleges, who were aware of Plaintiff's behavior and the impact it had on retention rates and who threatened to dissolve the Consortium. See Defs.' Mem. (#20) at 3–9. Defendants also provided documentation indicating Plaintiff was made aware of many of these complaints and about issues that appeared to have been directly linked to Plaintiff's attitude and behavior in the classroom and at clinical sites.

Cleveland-CC urged Plaintiff to work on and improve the way she interacted with students in several of Plaintiff's annual employment evaluations. While Plaintiff was not always made

aware about the specific details of the complaints against her, see id. at 4–5 (indicating both students and teachers feared retaliation from Plaintiff and that many asked Dr. Sain not to say anything about their complaints to Plaintiff), Dr. Sain noted that students complained about Plaintiff in several of her employee evaluations and counseled Plaintiff to improve student relations. See id. at 5.[8] Plaintiff's employment evaluations also consistently cited issues with low student enrollment and retention and indicate Dr. Sain advised Plaintiff that she needed to increase her performance in both areas. See id. at 8. Ultimately, documentation created during Plaintiff's employment (such as her annual employment evaluations and student evaluations) tend to corroborate Defendants' evidence acquired after Plaintiff was terminated.

Thus, based on the evidence in the record, no reasonable juror could conclude that Defendants' proffered explanation was a mere pretext for illegal discrimination. See Reeves, 530 U.S. 143. Beyond that, Plaintiff has failed to put forth evidence showing that discrimination was the but-for cause of her termination. The uncontested evidence establishes that Cleveland-CC honestly believed that Plaintiff deserved to be terminated for her unprofessional behavior and its negative impact on students, the surgical technology program, and its relations with clinical sites and partnering colleges—regardless of whether Plaintiff did, in fact, behave inappropriately, or whether such behavior actually had a negative impact. See Holland, 487 F.3d at 218 (upholding summary judgment where the decisionmaker "honestly believed that Holland deserved to be discharged for threatening Peck, regardless of whether Holland did in fact issue the threats"). What matters is that Cleveland-CC honestly believed Plaintiff's behavior was damaging its business

---

[8] See supra, note 3.

relations and reputation in the community, not whether its decision to terminate Plaintiff was prudent or fair, as the Court does not question a defendant's non-discriminatory business decision.[9]

Plaintiff's evidence fails to show Cleveland-CC did not honestly believe that her behavior was a legitimate business reason for terminating her employment and, ultimately, "[i]t is the perception of the decisionmaker which is relevant." Id.; Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 444 (4th Cir. 1998) (affirming summary judgment where the plaintiff offered no evidence that the events recounted in the decisionmaker's affidavit "are untrue or that retaliation was the true reason for [the] firing" and explaining the uncontested evidence established the decisionmaker "honestly believed that Tinsley deserved to be discharged"); see, e.g., Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006) ("In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible.").  As such, the Court will grant summary judgment for Defendants.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment (#19) is **GRANTED**, and this action is **DISMISSED** with prejudice.

The Clerk of Court is directed to enter a Judgment dismissing this case.

Signed: May 9, 2019

Max O. Cogburn Jr.
United States District Judge

---

[9] The Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination" so that "when an employer articulates a reason for [its treatment of the plaintiff] not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [employment decision]." Huie v. Univ. of Md. Med. Ctr., No. 1:04-cv-02987, 2006 WL 197183, at *3 (D. Md. Jan. 23, 2006) (citing DeJarnette v. Corning, Inc., 133 F.3d 293, 298–99 (4th Cir. 1998) (quotations and citations omitted)).